## OHMER REGISTER CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 9091.

Circuit Court of Appeals, Sixth Circuit.

Nov. 30, 1942.

Guy H. Wells, of Dayton, Ohio (Wellmore B. Turner, Guy H. Wells, and E. H. & W. B. Turner, all of Dayton, Ohio, on the brief), for petitioner.

L. W. Post, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Newton K. Fox, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before HAMILTON, MARTIN, and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The taxpayer, Ohmer Register Company, has petitioned for review of the decision of the United States Board of Tax Appeals determining deficiencies in income taxes and excess profit taxes for the calendar year 1936. The petitioner is an Ohio corporation engaged in the business of selling cash registers and other products manufactured by the Ohmer Fare Register Co., a corporation which owns all of petitioner's capital stock.

Consistently since its organization in 1932, the petitioner has kept its books and rendered income tax returns upon the accrual basis. In determining the deficiency, the Board of Tax Appeals upheld the denial by the Commissioner of Internal Revenue of the right of petitioner to deduct from its gross income for 1936, as a regular and necessary item of business expense, a reserve for sales agents' commissions set up on its books as accrued and earned by its agents from sales made by them during 1936.

To clarify the issue presented, it is necessary to discuss in somewhat extended detail the rather complicated agreement between the petitioner and its sales agents. The form of agreement with its sales agents had been in constant use since the inception of petitioner's business in 1932, as likewise had been the method of bookkeeping for tax reference in use by petitioner during 1936.

Two instruments constituted the contract: an agreement known as "Form C-331" and an attached rider designated as "Rider 1-E." The sales agent's agreement, Form C-331, provided that the agent should receive as full compensation for his services and expenses a commission on monies received by the company from the sale of its products as stated in the attached rider, expressly made a part of the agreement; and that these commissions should be paid on the amounts of the total net sales, after deducting discount for quantity orders and for any other allowances to the customer, except cash discounts and "trade-in products" accepted on orders for Ohmer products and paid for by the agent as his property. Should the trade-in allowance not exceed the agent's advance commission, the amount allowed on the trade-in by him would be deducted from his advance commission on the sale; but, if the trade-in allowance exceeded the advance commission, the agent was required to send in to the company, with the order, his check for the difference between the amount of his advance commission and the amount allowed for the trade-in.

Should a purchaser countermand his order, refuse to accept the product ordered or deliver an exchange product as agreed, or tender a dishonored check; or should the company take back the product sold or commence repossession proceedings, the commission credited on the original transaction was required to be charged back to the agent's commission account. The agent's commission account would be credited with the proper rate of commission on the amount actually paid by the customer, if no reconditioning or repossession expense had been incurred and no refund to the customer made by the company. The agent's commission account would be credited with the commission on the amount actually paid by the customer "after deducting the cost of reconditioning the register and/or cost of repossession."

The agent was required to create and maintain a competent, efficient and experienced Service Department and to have on hand at all times a sufficient stock of Ohmer repair parts "to keep all Ohmer products in his territory in satisfactory, efficient operation during the period of the company's guarantee thereon." It was agreed that, in consideration of the commissions to be paid to the agent, he would without charge repair at any time, in compliance with the company's regular guarantee, any Ohmer product "out of order from ordinary use," and in his prescribed territory would also repair any Ohmer product "on which there still remains a period of free repair."

Upon termination of the agreement, the agent's account would be settled by a determination, three months thereafter, of the amount still owing him on his sales; and a statement of his commission account showing commission credits, advances, charge-backs and miscellaneous credits and debits would be rendered. Similar settlements were to be made at subsequent intervals of three months. On this method of settlement, it was provided that if the credit balance of the agent on the books of the company should exceed the total possible commission charge-back, the difference would then be due and payable to the agent. If, however, at any such accounting period the agent's account should show him indebted to the company, he was required to pay the indebtedness immediately, or to make arrangements for its liquidation acceptable to the company.

Provision was made that the agreement in writing should constitute the entire contract between the parties; and that the contract could not be changed, varied, modified or explained in any manner whatsoever, except by agreement in writing signed by a duly authorized executive of the company.

The foregoing constituted the pertinent provisions of the agreement known as Form C-331, which contained 34 numbered clauses. The attached Rider 1-E, expressly made a part of the contract, contained further pertinent provisions, which will be quoted:

"2. The following rates of commission will be credited to Agent subject to the remaining clauses of this Agreement on all Ohmer Cash Register orders received from Agent and accepted by Company after the effective date of this rider; * * * [advance commission (A) 10%, collection and service commission (B), at varying rates, are set out].

"3. To assist Agent in financing himself, the Company, after its acceptance of an order and after it has received the customer's signed delivery receipt and at least 10% cash with order, and so long as the condition of Agent's account and character of Agent's business warrants, will advance to Agent 10% of the net price of the register or registers after all deductions for discounts and other allowances (except cash discounts and trade-in allowances) have been made. In addition to the above 10% advance commission, the Company will pay Agent a collection and service commission as specified in column (B) above on the balance owing after 10% of the net price of the register or registers has been deducted, and after the money owing has actually been collected from the purchaser and received by the company. The acceptance of a promissory note by Company from a customer shall under no condition be considered as payment of customer's account."

The requirement that the agent should repair Ohmer Cash Registers and products was based upon the petitioner's contracts with its customers in connection with all deferred payment sales and frequently with cash sales, as well, to make free repairs for one year if the purchaser would pay transportation charges to and from the factory. The company was bound to fulfill its obligation to the customer in this respect, whether or not the sales agent fulfilled his assumed obligation to the company.

A sales contract, when signed by the purchaser, was forwarded to the petitioner for acceptance; and, when the merchandise was shipped, the full amount of the sales price was charged upon the petitioner's books to the customer's account and credited to gross income, whether the goods were sold for cash or on a deferred payment plan, evidenced by notes or otherwise. No book entry of sales was made until the goods were shipped. The total amount of the net sale, that is the actual amount to be paid by the customer after deducting cash discounts and trade-in allowances, was entered from the invoice, irrespective of the amount of cash received with the order.

The Board of Tax Appeals, in its findings of fact, has thus described the manner in which the petitioner made its bookkeeping entries with respect to its agents' commissions:

"After acceptance of the sale order and at the time of the shipment of the cash register sold, entries with respect to the transaction were made on petitioner's 'Commission Record,' under several headings or columns indicating, in substance, the following: Date of Sale, Name of Customer, Notes given and Trade-Ins, if any, Net Amount of Sale, per cent of commission as shown by the sales agent's contract, Total Commission; and then under Current Commissions were placed Credits, Commission Earned, and in a second column under Current Commis-

sions, were placed Debits, Check and Charge Backs, which were followed by the heading 'Reserve Commissions,' followed by 'Prospective Commissions,' which latter represent the difference between the total commissions and the amount credited under 'Current Commissions.'

"Commissions were figured at the contract rate upon the sale's price and entered upon the petitioner's record in column headed 'Total Commissions.'

"The commissions due the agent when a sale was made, accepted and 10 per cent of the selling price was actually received by the petitioner, were entered in the column of agent's account headed 'Current Commissions.'

"The aggregate total of the balances on the commission accounts of the sales agent was shown on the commission record as 'Prospective Commissions'; and 'Reserve Commissions' were carried on General Ledger Account No. 242-1 under the name 'Reserve for Sales Agents' Commissions,' which it was the practice of the petitioner to set up as a reserve (termed a misnomer by witness for petitioner) in each taxable year and claim a deduction therefor.

"The total commission column also was reflected in the general ledger, in account number 215, named 'Accounts Payable, Unpaid Commissions.'"

Some agents occasionally assigned their commission accounts as collateral to secure bank loans; and, in such instances, the petitioner accepted the assignments without guaranteeing payment of the loans, and issued checks covering the agents' commissions payable to the assignee. There were instances, also, where sales agents were paid their earned commissions before petitioner had received payment from customers on orders upon which the commissions were earned.

The Board of Tax Appeals conceded the right of a taxpayer keeping books and filing income tax returns on the accrual basis, to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business (Section 23 of the Revenue Act of 1936, Ch. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, page 827); and conceded, also, that the taxpayer may deduct, as expense incurred, a liability which has accrued during the taxable year, "although payment is not presently due." United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; American National Co. v. United States, 274 U.S. 99, 47 S.Ct. 520, 71 L.Ed. 946; Aluminum Castings Co. v. Routzahn, 282 U.S. 92, 51 S.Ct. 11, 75 L. Ed. 234. But, pointing out that except as otherwise specifically provided by statute, a liability does not accrue as long as it remains contingent (Weiss v. Weiner, 279 U. S. 333, 49 S.Ct. 337, 73 L.Ed. 720), that "reserves" have a definite meaning and limitation under the taxing statutes (Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725); and that, though a prudent business man often sets up reserves to cover contingent liabilities, such reserves are not necessarily allowable as deductions (Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538, 67 A.L.R. 1010), the Board held that the commissions in controversy "were not incurred and definitely fixed" during the taxable year so as to constitute an allowable deduction for income tax purposes, but, on the contrary, were mere "contingent liabilities" of the petitioner. Upon the principles of Brown v. Helvering, supra, the manner in which petitioner carried sales agents' commissions upon its books was deemed inconclusive of the right to deduct. It was said that any system which accrues contingent liabilities as expense items does not correctly reflect, but distorts, income. Stating that United States v. Anderson, supra, involved "an unconditional liability," the Board held that the instant case involved contingent liabilities, in that all events which determined the liability of the petitioner to pay the sales agents' commissions had not occurred during the taxable year 1936, inasmuch as the commissions were dependent upon collection of the sales prices of the cash registers.

In urging reversal of the Board's decision, the petitioner insists that the items of commission expense set up on its books are not contingent, but are fixed, definite and accrued items of corporate liability, deductible as ordinary and necessary business expense under Section 23 of the Revenue Act; that, even if the liability of petitioner to pay the commissions is considered contingent, the same contingency exists with respect to the income from the identical transactions on which the commissions were earned; that, regardless of the question of contingency, the agents' commissions were never a part of income of the petitioner, but merely constituted

funds passing through its hands as a conduit to the agents; and that the petitioner's method of accounting clearly reflects its true income.

■ The principles which this court applied in Air-Way Electric Appliance Corporation v. Guitteau, 6 Cir., 123 F.2d 20, uphold the petitioner in the instant case upon its main contentions. Our conclusion from the findings of fact of the Board of Tax Appeals and the record before us is that both the petitioner and its agents· have treated the agents' commissions as earned and as definite obligations of the petitioner entered as such on its books at the time goods were shipped pursuant to accepted orders.

The petitioner kept an "Agent's Commission Ledger Account" book, into which was entered under the heading "Total Commission" the full amount of an agent's commission immediately upon acceptance of a sales order received through him. Thus, the petitioner evidenced its recognition of a specific item of accrued expense as a fixed liability. The fact that the agent might not, in the end receive his full commission is no more material than that the petitioner might not receive full payment of the purchase price of the article sold. Petitioner's books were kept and its income tax returns were made upon the accrual basis.

■■ The essence of the accrual method of keeping accounts and making returns is that the right to receive and not the actual receipt determines whether an amount should be included in gross income. The right accrues when the right to receive the amount becomes fixed. Spring City Foundry Co. v. Commissioner of Internal Revenue, 292 U.S. 182, 184, 54 S.Ct. 644, 78 L.Ed. 1200. Correspondingly, the right to deduct an expense item accrues when the fixed obligation is incurred, even though the amount may be diminished by subsequent events. Both sides of the ledger must be treated alike. Bonded Mortgage Co. of Baltimore v. Commissioner of Internal Revenue, 4 Cir., 70 F.2d 341.

To divide the sales transactions here involved so as to treat them upon an accrual basis with respect to income and upon a cash basis with respect to expense in commissions in making sales from which the income was derived would be as objectionable as the division condemned in Air-

Way· Electric Appliance Corporation v. Guitteau, supra.

■ Moreover, the mis-nomenclature in reference to the commission accounts, as described on the books of the petitioner, is no more important to the determination of realities in this case than was the misdescription on the books of the company in the Air-Way case, where it was said: "It is true that the taxpayer styled its reserve account as a 'Reserve for Contingent Collection Expense,' but the mere designation of a reserve as based upon a contingency is not controlling if, in effect, it appears to be something other than a contingent obligation in the true sense." 123 F.2d 23.

[5] We see no valid reason for regarding the commissions as contingent liabilities rather than as definite obligations from the circumstance of inconsistent expressions in separate clauses of the agency contracts, wherein in one paragraph it is provided that the agent will receive as full· compensation for his services and expenses "a commission on monies received by the company for the sale of its products," and in another paragraph it is said that "commission shall be paid on the amount of total net sales after deduction for quantity ordered and any other allowances."

The first mentioned clause would seem to concern the time when money may be demanded by the agent; the second, the amount of the commission payable. But, however that may be, both the petitioner and its agents have·treated commissions as earned and as definite obligations of the petitioner, from the time the same have been entered on the books of the company.

In our judgment, the net income of the petitioner for the taxable year involved could not have been correctly determined upon the accrual basis, without deducting the commission expense from gross income. The method adopted clearly reflected the taxpayer's true income (American National Company v. United States, 274 U.S. 99, 47 S.Ct. 520, 71 L.Ed. 946), upon scientific accounting principles (United States v. Anderson, 269 U.S. 422, 440, 46 S. Ct. 131, 70 L.Ed. 347).

The items of commission expense claimed as deductible under Section 23 of the Revenue Act were not contingent liability but were definitely incurred and fixed liabilities within the taxable year.

The decision of the Board of Tax Appeals is reversed upon mandate that the deduction from petitioner's gross income for 1936 be allowed as prayed in the petition.